Before we call this first case, I see that there's a number of exhibits here in this courtroom. Are those by the plaintiff or the plaintiff's appellant or the defendant at police? Plaintiff's appellant, Your Honor. All right. So my question is, did you advise the other side that you were going to seek leave to use exhibits today, this morning? Yes, I did, Your Honor. I've been ordered by Judge Justice Gordon a couple of weeks ago to run on these exhibits. Okay. All right. I couldn't recall that order. And there's no objection from the other side? Notwithstanding the fact that we're not certain that all of these exhibits were produced to us, there is no objection. Some escape our recollection. We're just not sure. In particular, these two photographs behind counsel and myself. But having said that, there's no objection. Well, I will then use this moment and take this opportunity to advise both sides that today, during oral arguments, the arguments must be confined to only matters that were presented to the trial court before the final, the 304 order. Neither party can use exhibits or make arguments about amended complaints that were never filed or anything after the court's decision. I hope that's clear. So we don't want any arguments that were not presented in the briefs, that were not presented to the trial court. So if there's anything that either one of you are planning to argue that was not before the trial court, you may not do so now. Certainly. But identify yourself for the record. I'm sorry. Go ahead. My name is Philip Bazzo. I'm a 707 counsel appointed. And I've been working with the Planned Parenthood Association. Okay. And counsel? James Zabel, Z-A-B-E-L. James Zabel from the Metropolitan Law Reclamation District. Your Honor, if you'll indulge me, I do want to acknowledge and introduce co-counsel Ellen Marie Avery of the district who has worked with me on these matters since their inception. Okay. Other counsel? All right. Are each of you going to be planning on commenting in our oral argument? Yes, Your Honor, but just a couple of minutes. Sure. Well, we'll give both sides, you know, 20, 25 minutes. I mean, this is not a panel that cuts people off. But we try to, you know, give it equally. And appellant's counsel will have the same amount of time. All right. And you can save time out for rebuttal. Now, what questions did you want to ask the court? And you may be seated if you wish while counsel addresses us. Certainly. Certainly. Good morning. Good morning. Last week we filed a motion for leave to file a proposed second-amended, fifth-amended complaint, relating only to the particular issues involved in the damage claim, the constitutional damage claim. We have not ruled on yet. Fair enough. Your Honor, I had litigation anxiety earlier this week and sought to withdraw the earlier motion, but Justice Gordon already entered an opinion on April 24th. What situation I'm trying to avoid is not being able to argue a constitutional damage claim. If we let the damage, if we, the proposal is to just simply proceed on a constitutional damage claim and waive and abandon the constitutional taking argument. However, if the court finds that the complaint does not state a constitutional damage claim, I want to argue today a constitutional taking case. So that's why I raised the issue. Further in that regard, Your Honor, thank you for coming. Your Honor, I'm going to take down some exhibits right now which are inappropriate because they were part of the proposed second-amended, fifth-amended complaint. But since the court has not ruled on that motion, that's not certainly part of the record. So I'm going to take them. Well, it wouldn't be part of the record if the court didn't consider it. Only the things the trial court considered should be addressed today. Certainly, Your Honor. So let me take down the exhibits. Before you do that, I wanted to make one thing very clear. If you make a motion and the motion is denied, you don't make the same motion again. If you want to make a motion to reconsider, you could do that. But if you make the same motion again, you could be sanctioned. And when you make motions for clarification, they're only good if you could show us what confused you in the order that need clarification. Thank you. Is that what I'm saying? I fully understand. And there is no lack of clarity in your order. The order was clear that we, in fact, had. I know it was. But you seem to want clarifications on things that do not need clarification. So I want you to be very careful with those two points because we do not like to say the orders. But you're getting to the point where you make the same motion over and over and over again. Thank you. Then I will not file any additional motion. I appreciate the court providing that information to me. Thank you, Your Honor. Okay. So I'm going to take down the exhibits right now, if I may, just so that it's clear. Thank you. Thank you. Thank you, Your Honor. All right. Well, we have a little more space. All right, Mr. Basso, are you ready to begin? I'm ready, Your Honor. You may begin. In this case, the forest is artificial flow law. We focus too much, I think, on the trees sometimes as areas of law. But this is a claim predicated upon artificial flow. As indicated in the briefing, part of the report, which is C-598 states, urbanization has eliminated much of the natural drainage system tributary to the Prairie Creek. Stormwater is now conveyed primarily in enclosed culverts and storm sewers where drainage was once open channels. Now, in the complaint at paragraph 25 and 26 and 27, we talk about the public improvement, which is the PCSS. Your Honor, in your opinion, in 2016, the incapabilities were gravity fed. The point really I was trying to make was that these are gravity discharge rather than pump discharge. The Heisenberg Court, back in 1990, proposed here in the Bowery Basin, at this very corner, a pumping station. If you're watching Channel 5 News today, you would have seen that there were temporary pumps being used, mobile pumps by a particular municipality to pump out some flooding problems. And just very emphatically, this is not a riverine flooding case like Hampton. This is a panisheed sewer back-damage site, based on, again, artificial flows. All the flows here are artificial, as is the Tension Basin, the Pavilion Basin. All the flows here, this is a channelized drainage relay up to the point E between C-1 and E, is a channelized drain. The original path in the current brief, 50 years ago, was basically an open shape, a semi-circular shape that we talked about at the point. The point of our discussion is that this is all artificial flow. There is zero natural flow. Zero natural flow involved in this process. At page 57 of our opening brief, we refer the court to dealers, the adjacent property possession document. We also refer the court to Restatement Third and Towards, Section 54. We submit that, again, the fourth, before we get into the constitutional issues and statutory issues, the fourth is going to be Restatement Third, Section 54. Your Honor, Justice Gordon, you did discuss a restatement when analyzing the intentional tortiousness of the conduct of advocates. In this case, what's the issue in this case? Yeah, let's get to the issue. The issue in this case is that these are all artificial flows. So let me proceed why this is important. There's a conflagration within the taking law where sometimes dominant state overburdening gets into taking. That is not the issue. The issue, again, is that the common law in the statement is the possessor of land has the duty of reasonable care for artificial conditions or conduct of the land owing to others. That is the fundamental force. Let's go to the particular tree involving the public duty rule. Doesn't the issue have something to do with what the Coleman case holds? It has something to do with what takings and damages means. Coleman discussed, obviously, Sabin explicitly rejected the public duty rule. You may recall the Court's opinion in Sabin discussing the Michigan rule. The Michigan rule is the public duty rule. Sabin explicitly rejects the public duty rule in Sabin stating that we're not going to follow the Michigan rule. It was criticized by Justice Cooley. In Michigan, Justice Cooley is probably the most revered historical legal figure we have. The court in Coleman, I believe, maybe in Munson, said it clearly. Are you talking about whether it's retroactive or prospective? Yes, I am here. Isn't that the issue here? Whether it applies at all, our first argument is the PDR has never, never been applied in the history of the state by the Supreme Court to a public improvement. In fact, in Sabin, again, I quote exactly from Sabin. Forgive me, I don't have the exact quote to read to you right now. But Sabin explicitly rejects the Michigan rule, which is the public duty rule. Mr. Basso, may I just interrupt you just for a moment? Yes, go ahead. Sometimes we have trouble hearing people in this courtroom, and today we're not having that problem at all. Oh, I'm sorry. If you could just back it up a little. Thank you. I had too much coffee. Oh, no, that's all right. Just if you stay a little further away from the microphone. Okay, perfect. I'm sorry. That's all right. So to address your question, Justice Gordon, please look at Sabin. The LVs don't even talk about Sabin for the reason if you read Sabin fully, you'll know that the Supreme Court in 1898 rejected the public duty document. There's no other case of public improvements. The second argument, Your Honor, is if you analyze Munson and the phrase in Munson, except as otherwise provided in this article, Munson found that that was a limitation on duty, as opposed to a limitation on immunity. The critical aspect of that is that that then would preempt the common law public duty rule. Again, the public duty rule was rejected in Sabin. Further, if we want to go through the analysis of Alexander, the key factor here, Your Honor, is that we want to follow the Tort Immunity Act. Let's follow the Tort Immunity Act. In this case, this is a 103-102 Act case. Going particularly to 103, and by the way, I noticed that in the, this is sort of important on the takings issue, Your Honor. With regards to Sorrells, this is in the record, and this is critical on the constitutional damage claim. Most of the stormwater is coming not from Advocate, but from upstream sewers, which the district has control over and collects water, besides Park Ridge sewers and Maine Township sewers. Specifically, if we go to the C-301 in the record, last paragraph, the area upstream of the North Campus detention pond, including the North Campus itself, is slightly less than one square mile. So that's what the upstream water is, is one square mile upstream of the Edgecote property on the north development. Then Hamilton says, the area of the South Campus, the South Campus is this area right here, Your Honor. This is taking the identical page. The South Campus is down in this area. So this is the North Campus. South Campus is down in this area where the Maine House is located. But again, this is critical because they argue, this is a Sorrells case. I'm sorry, this is not a Sorrells case, okay? Clearly, the upstream stormwater, as Advocate will point out, is in fact predominantly coming from, obviously, areas upstream of the Edgecote property. So this is not Sorrells in any way in terms of drainage coming from a private subdivision, okay? Further, getting to the issue of private subdivisions, Sorrells also, these retention basins, we plead, again, are owned and operated by the LPEs. That's why both the HARSA report, the ID&R report is addressed to the district, Maine Township, and Park Ridge. It's not addressed to Advocate. This is a public system, public improvements. This is basically a simple PNESHE case, Your Honor, a simple, simple, simple PNESHE case. PNESHE, the court had no problem in filing a constitutional taking claim in PNESHE. This is far worse than PNESHE. We have homes filling with water, the basements entirely, going up to the first floor as we plead in the amendment to the amendment complaint. That's the one that was rejected by the court? What? The Fifth Amendment, are you referring now to the Fifth Amendment amended complaint? I'm sorry, no. The amended Fifth Amendment complaint, the A5AC is our controlling complaint, filed on January 20, 2012. That's in that complaint. You'll see where we allege that the basements filled with water going to the first floor. In PNESHE, the PNESHE workers got down to look at the drain and see, oh, yeah, the water's flowing. Here, the basements are full. The other aspect of why I think Arkansas Game and Fish and Hampton doesn't really fully explain the situation is because this is home-invasive, not land-invasive flooding. When these homes fill up, imagine your basement filling up with water, going up about six inches, okay, when they fill up with water, everything is damaged, the drywall in the basement, the carpeting in the basement, and it smells. It smells. If you've been in a flood situation, lived in a flood situation, that renders it uninhabitable, and going back to PNESHE, PNESHE holds, relying upon two seven-circuit decisions, that uninhabitability renders a constitutional taking claim constitutionally wrong. Why don't we get to the issue of this case, whether Coleman is retroactive or not? Isn't that the issue of this case? Yes, it is. But you're talking about got nothing to do with the issues of this case. Well, I beg to differ. I understand that, but here's the problem. We write the decision, not you. So if you're not going to argue the right thing, you're going no place. Okay. The first argument was that the public duty rule has been rejected by the Supreme Court explicitly in Sabin in 1898. When they rejected the Michigan rule, criticized by Justice Cooley, Justice Cooley is quoted in the Coleman decision. Didn't the Coleman decision effectively and clearly enunciate that the public duty rule is no longer Illinois law? Not as the public improvements. Not as the public improvements. That's correct. If you look at Coleman carefully. Okay. But you're saying Sabin did. Sabin did. And never in the history of the State, even if you look at Alexander, no court has ever applied to a public improvement. Article 3 involving public property is different than any other claim. Be it constitutionally protected or protected under the statute under section 3-103 or 3-102. What I'm saying is that, again, you take a look at Coleman. I don't know how the Supreme Court missed Sabin, but they missed Sabin. And, again, that only applies to fire and police services. As we submit in our supplement brief, what the district does really, they're a quasi-public utility. They can charge for the services of stormwater management. It's like any other business. It's not like you have to respond to an emergency for a police or a fire. So what I'm saying, in the first instance, the PDF has never been applied to a public improvement. Coleman, as you may remember. So it shouldn't have been applied in any of them. What? Public duty rule doesn't apply to public, what you just said. No. The public duty rule has never. Has never? Never been applied on facts of a sewer system. I thought that's what I just said. Okay. I'm sorry. I may not have heard you clearly. So it's never been applied. And, again, please, Sabin has explicit language rejecting the Michigan rule, which is the public duty rule. So in the first instance, that's the one argument. The other argument is, again, in Munson. When the court said, interpreted Article III, the prefatory clause, except it was otherwise provided in this article. Remember, they consider that as a limitation on duty. Let me ask you this. Yes, go ahead. When was the public improvement put in? Before Advocate or after Advocate? The large retention basins were installed after Advocate in the 1990s. The basins that you see on this diagram, the Ballard Basin, those were after Advocate to control the property. Well, actually, you know, isn't your argument that the retention plans, the retention plans didn't do the job? That's correct. They're insufficient. They shouldn't pump out. The LP, the district, main township, and parkers were told back in 1990, you need to have a pump to pre-storm pump the basins. Again, as you mentioned, these are gravity. Their public improvement that you're talking about didn't cause the problem, did it? It did, Your Honor. It did. How did it? Because it was insane. You're saying it wasn't large enough. That's correct. It was inadequate. Not only that, but they had strategies for pumping down the basement provided both by HRSA in 1990. You see the pump station here on the diagram. And the IDNR back in 2003-2004 said you need a pump station to stop the flooding. Flooding, this is a large basin. Look at the area of this basin here, Your Honor. Well, where could they have put additional retention plans? I mean, where on the property did they put additional retention plans? Let's just talk about step one, pumping down the basins, pumping down the basins. As recommended, if they pump down basements, they have all that storage capacity, Your Honor. That's the theory behind pumping down. Where has there ever been a duty on any municipality to pump down anything? Well, this is their public property, Your Honor. This is a Section 3-103A plan. I mean, do you have any case where any municipality was required to pump down anything? I mean, show me a case that says such a thing. Well, but they're operating – this is a sewer, Your Honor. No, no, I understand what it is. This is a sewer. And, you know, Penicia was on a pump down case. I can look to see if – but the point is they knew how to solve the flooding in 1990. This is – and, again, the reason why we also focus on the constitutional claim is because that avoids the statutory immunities of the Tort Immunity Act and the Common Law Public Duty Rule. Remember the minority opinion in Van Meter. In Van Meter, the minority opinion said, look, the plan is going to lose on discretionary immunity when they go back. However, they have a constitutional claim that will not be barred by the TIA. All right, so you're telling us it doesn't make a difference whether Coleman is retroactive or not. Is that what you're telling us? Well, no, I'm saying, first, it never applied in the history of the state to a public improvement. Never. Please, the statement of language, where they reject the Michigan Rule, which is a public duty rule. Secondly, the prefatory clause in Section 3-102A, which says, except as otherwise provided by an article, was interpreted by Munson to be a limitation on duty. As a limitation on duty, that conflicts with the Common Law Public Duty Rule and preempts it. And then, of course, there's the constitutional arguments that, under Van Meter, the particular statement made in the minority opinion was real clear. And what the court- I mean, that's in the dissent you're talking about. Pardon me? You're talking about the dissent in Coleman? Yes, the dissent in Coleman. Right, right. And, again, Panesci is the governing case. This is not riverine flooding like you may have seen on television today with regards to Davenport or other communities. This is a storm sewer, a public improvement. The duties are much different. The controlling case is Panesci, as we said in our brief. In Panesci, the Supreme Court makes very clear-I'm sorry, the Court of Appeals- I thought that was the Second District of Philadelphia. It is Second District. I'm sorry, forgive me. They make very clear that, in their opinion, that the two workers-yes. Quote at page 725, 726, This deprivation was a taking of plaintiff's property. As one reviewing court has stated, if government makes your house uninhabitable, that is a taking of your property, even if you retain a clear title. We assert, by the way, that a constitutional damages claim is a lesser-included offense when taking. So if we prove a taking, we've proven a damage claim, a constitutional damage claim. Well, you know, I don't do criminal law, Your Honor. This is all that I do, so I'm just- Well, I know, but that concept doesn't really have any flexibility at all here. Well, but I think, though, if you prove a taking, you've proven a damage claim. I hope that that's what the court finds on that issue. And, again, Panesci- We're talking about a dismissal here. Yeah, we are. You don't have to prove your case at this point. The whole thing here is whether or not the court properly dismissed your complaint. And the point in Panesci, again, quoting, intent is not required, as is required in Hampton, quote, the operation of public works resulting in the deposit of water or earth onto property, destroying or impairing the property's usefulness, renders it a taking. And, remember, Pompalli cited both, I think, in Hampton besides in Panesci. They don't need to own the property. Only, and in this case, we argue that they own the property, but controlling the property is just as good. And, please, Justice Fitzgerald, in his minority dissenting opinion, said, though 2-201 of the Tort Immunity Act, bars the claims, tort claims, properly pleaded constitutional claims could survive under the Act. So the Supreme Court granted, Your Honor, its dissent or minority opinion. I think it was actual concurrence in the actual reversal. In this situation, what you find is that the court has stated, and here's Justice Fitzgerald again, when a public entity, the settling of private property caused by a public improvement may affect an unconstitutional taking. If a city, quote, creates in his neighborhood a stagnant pond that brings disease upon his household, that's a taking. Again, water, you'll see the pleadings. Water fills the basement. It's stagnant in the basement. It renders it uninhabitable. And, by the way, there are two Seventh Circuit decisions in Pineshie supporting the inhabitability rule. I'm thinking about winding up. Okay, sure. We're going to hear from all three of them, and you're going to have an opportunity to respond. Certainly. But the last, let me just go to the last issue I want to raise. Discretionary immunity has been the death knell of most plaintiff litigation in this state, especially within this area. In Section 3, and this goes to the public duty argument also, the public duty shouldn't supplant a life slave declaration. Please look at Justice Thomas' discussion in Hampton. But with regard to Section 3-103, discretionary immunity is abolished for any plan or design that proves in its execution that it's not reasonably safe. There's just no immunity for an LPE for that. Quoting, a local public entity is not liable under the article for an injury caused by the adoption of a plan or design of a construction of an improvement that has been approved in advance of the construction or improvement by the legislative body of such entity or by some other body or employee exercising discretionary authority to give such approval. Where such plans or where such plans have been prepared in conformity with design. So going back to the Munson analysis, Section 3-103A specifically discusses discretionary immunity. And then, Sentence 2 negates that immunity. Unequivocally negates that immunity. Let me just read it to you. The local public entity is liable, however, if after the execution of such a plan or design, it appears from its use that it has created a condition that is not reasonably safe. Your Honor, we state a claim under both Section 3-103A, Sentence 2 for an after plan execution, dangerous condition. The plans we list in terms of our pleadings, the plans have not been defective, obviously. They didn't even use the plan that they were told to use in Arizona. And thank you.  We will allow you some time for rebuttal, Mr. Franzo. All right? Thank you. Mr. Zabel, you're going to address the Court first. All right. You may step up to the podium and proceed. Good morning again. Good morning. Good morning. Well, I have – I have – how's this? All right? Yes. I have distilled 11 years of litigation down to seven 3-by-5 cards. Good. But in all candor, I don't think I require them. What I'd like to do with your leave is spend just a couple of minutes discussing the public duty rule and specifically the issue of retroactivity or non-retroactivity, a couple of minutes on the takings component, and perhaps a couple of minutes just responding to some observations that Mr. Basel made that I think may have been inaccurate or even incorrect. But the Court spoke as to one of them, the Pineschi being a second district opinion, that this appellate court previously found was not binding. So I could check that off the list. All right. Needless to say, I think Judge Hall got this right. She spent more time on this case than on probably all of her other matters combined. And ultimately, at the end of the day in 2015, we received a very well-reasoned and thoughtful order that articulated with specificity why the repeal of the public duty rule should not be applied retroactively to this matter. And to that point, as I think the courts know, of course you've read the briefs and the research attorneys have read the briefs, so I'm not going to argue at great length. But Judge Hall specifically found the nature of the case, the procedural history of it, if you will, the extensive motion practice over and over again a half a dozen times the public duty rule. Well, what are the factors we're looking at? Why don't you get to that? So that's it. The inescapable truth that the local public entities have relied upon the public duty rule since day one for years, I don't think anyone, I don't think this court could say that anyone could foresee the abrogation of the public duty rule. And last but not least in this case, and Judge Hall alluded to that, Judge Hall also found that it would be an injustice to the local public entities to apply it retroactively. I'll go one step further. It would be an injustice to us and it would be an extraordinary burden, both factors. Let me stop you there for a moment. When advocates made their application to build their plans, I mean the municipalities had to know that that would cause flooding to those homes. No, Your Honor, I have to respectfully disagree. Quite the contrary. When those, and you thankfully have restored to my memory one of the things on my checklist, an observation Mr. Bozzo made, the local public entities don't own those facilities. As I think you correctly intuited, they're owned by the hospital. They okayed the engineering plans. They okayed the retention ponds. They issued permits. They okayed that which is supposed to alleviate flooding. Yes. And they didn't do it here. So in that triangle, Your Honor, what have you articulated? Is it a tort or is it a taking? Well, I understand that argument. I think Judge Hall found it's a tort. Your argument that, you know, the municipalities, you know, didn't know that this was going to happen, you know, that's not true. They have the obligation, okay, because they okayed plans. Now the question under the law whether that's the issue here, whether, you know, whether they can be sued for it, that's another thing. Understood, Your Honor. To your point, one thing I want to add to this calculus, you can't turn a blind eye to the fact, and I think that my colleague, Mr. Basel, cites to this, you can't turn a blind eye to the fact that that community experienced flooding before any of these reservoirs were constructed. Absolutely. You agree? I agree, 100%. That's why maybe they should have denied the plans for advocate to begin with. But, Your Honor, I don't know if we disagree or not, or we're just engaging in scholarly debate, but I like to think that tacitly you know that these things were designed and built with a view toward ameliorating a hardship in the community, not exacerbating it. So that was the, I suppose, intent. That doesn't mean that it didn't go wrong or that it shouldn't have gone wrong. You're absolutely correct, Your Honor. By the same token as we speak now, unfortunately I'm sure there are people in the community that are experiencing today, right now, some degree of flooding. This is not intended, and I'm here to tell you for a variety of reasons, all the deep tunnels and reservoirs in the world won't solve that problem. Yeah, but on the non-constitutional issues, are we really concerned with intent or are we concerned with negligent conduct? I think it's negligent. Sure. So I don't know that intent is really, you know, aren't we talking about in classic negligence terms? I mean, does intent have anything to do with it or is it a duty, a breach? I mean, we're careless because it's not. It's as you're saying. Sure. The intent is never to cause the damage. Negligence is, so. So it's as you say, so why wouldn't, again, one of the things on my checklist, so to speak, I respectfully disagree with my colleague. The public duty rule, for want of better words, has historically been embraced by this court, both in Haranac and in Alexander and in the Metropolitan Water Reclamation District's cases. I never saw, and I don't think this court has either, any failure to acknowledge, up until Coleman versus East Joliet, any failure to acknowledge the implications. But the issue here is very simply this is an issue of whether Coleman is retroactive or not. Absolutely, Your Honor. This is what this is all about. Absolutely. Not all this other stuff. So what are the factors and why and how are we reviewing it? What is our standard of review? Again, Your Honor, I apologize for being redundant, but it's as Judge Hall cited. The procedural history of the case, the local public entity's continued reliance for five or six years on the public duty rule as a basis for disposition. The fact that Judge Hall did dismiss the case five or six times, depending upon how you count the iterations of the complaint, the fact that no one could have foretold or foreseen the abrogation of the public duty rule, and last but not least, Judge Hall indicated the injustice to the local public entities to apply it retroactively nearly a year after the court had already ruled in disposition of the case. What is your response to counsel's argument that the public duty rule had no application in the first instance here? What is your response? He's saying that it really doesn't matter. I think he's just incorrect. I think he made a mistake in the same vein that he made a mistake when he said that the reservoirs were the property of the local public entities. They are not. It's not a case that would show it applies to public improvement. He's saying that Haven had long ago. I'm sorry, Your Honor. He's saying Haven had long ago already accepted this, that the public duty rule never applied to public improvement. Your Honor, he's in a different section of the law library than I am. I'm in the Heronic and Alexander and Cicero versus Metropolitan Water and River City versus Metropolitan Water. That's my bailiwick and that's my part of the library. I just disagree with my colleague. The other two factors you need to discuss. I'm sorry, Your Honor. The other two factors. The injustice. Whether or not it should be applied retroactively. Oh, because as I said. You've already said it was a big, no one expected abrogation. What's the second factor? The unjust burden. This case cries out for affirmation. It literally was a year later when Coleman was announced. The district, we were in the throes of briefing and arguing 304A language. Judge Hall asked us to also brief and argue the implications of the public duty rule as respects counsel's taking component. That was performed. We were on the, well, in my opinion, we were on the eve of 304A language when eight months later, along comes Coleman and we have to start, we have to go back to square one. And quite frankly, if called upon, I think my colleague just caught the court by surprise. He presented Tosado versus Miller and said the general presumption is retroactive and prospective application. Well, isn't that an accurate statement of the law? As far as it goes, but let's take a look at Chevron that articulates these other factors. And so Chevron Oil is infinitely more helpful to this court than Tosado versus Miller. What's the third factor? The unjust burden. That's it. As I said, just the duration of this litigation and the number of times that disposition was made in favor of the local public entities, earlier on, maybe a few minutes ago, I also alluded to a burden, so to speak. That burden speaks for itself. It's an uninsured loss. If the plaintiffs in that neighborhood were to recover, that's an uninsured loss to us now. There was no insurance in place at that time. So should we write that a municipality could do whatever they want and they're basically going to have immunity to everything? Of course not. They could destroy people's lives, their houses, anything they want to do. Of course not. Because they're a municipality. They have that right. Is that what we should write here? That's not what you should write and that's not what I'm asking. Tell me, what should we write? I'm asking you to affirm, Judge Hall, for the reasons that I stated, that the public duty rule did apply consistently and that Coleman should not be applied retroactively for the reasons I articulated and, more importantly, for the reasons that Judge Hall embodied in her order. Why? Because the municipalities would be prejudiced? Is that what you're saying? Oh, my gosh. They were arguably prejudiced. Well, how about the people who have to live in water every time they're drained? Are they prejudiced by anything? What rights do they have? Justice Gordon, who doesn't feel bad and who among us hasn't had water in the basement? Of course there's water and there's flooding. There's a difference. Doesn't the third factor require a balancing for both parties, whether it's inequitable treatment? So now you go to something that I don't want to say I glossed over, but I didn't speak to the underlying premise of the public duty rule because you know, of course, what it is, that a small segment of the community does not have a right of recovery. The public duty rule teaches that our metropolitan water obligation is to the community as a whole. All of the people who pay our salaries, not to a segment or a localized area, what have you. That's the premise of the public duty rule. Anything further you want to add before we let your colleagues or the attorneys for the other defendants? No, Your Honor. I do, if you don't mind, just less than a minute to respond to something I recall from counsel's reply brief. I don't know that it's dispositive. I don't think it's dispositive, but I still want to just briefly respond to it, and that's this. It's counsel's suggestion that the user charges that we collect be used to fund stormwater projects, and I just want to tell you that that's impermissible. The user charges are required by the US EPA and the IEPA, the MWRD. My employer is the local so-called control authority. We administer those programs. By law, the purpose of user charges is to collect, recover the cost of operating, maintaining, and replacing the treatment works. That is what's required to keep the plants in a state of good repair. There's absolutely no authority to use those funds for some of the projects that my colleague alluded to. That would be impermissible. All right. So thank you. Thank you for hearing us. All right. Mr. Jacoby? May it please the Court, and I will be very brief. I want to just address two topics. I want to crystallize some of the factors for the public-duty rule retroactive application, and then I want to talk about ownership allegations with respect to manned townships specifically, because I think Your Honors have addressed that a little bit. With respect to the public-duty rule, just to crystallize those factors, first is whether there's been a change in the law, and we know that there has. Public-duty rule was abolished by Coleman, and it previously existed for public improvements for sewer lines in Alexander and the Town of Cicero case. So it's uncontroversial, in my opinion, that there was a new rule. The second is that whether the history and purpose of the new rule, its operation will be advanced or hampered by the non-retroactive application. And this case is so unique that it really goes neither way, because there's a one-year statute of limitations for municipalities. And so if you apply this non-retroactively to the case here, there is no other opportunity for this to be applied non-retroactively, in my opinion, going forward. So it won't be hampered or hindered or advanced in this case. And then the third is the balancing of the equities, which my colleague, Mr. Zabel, talked at length to you about, so I won't get into that. But in this case, because we've been asserting the public-duty rule since 2010 through 2016, when Coleman was decided and gone through six iterations of the complaint, it's fair to the LPs to be able to rely on it in this case. Moving, shifting gears very briefly to the ownership interests of Maine Township, there's been some suggestion that the LPs own the basins. They don't. It's pled in the complaint that they don't. And I'll direct you to paragraphs 120.1 through 126 in the complaint. The plaintiffs do plead that these are on advocate's property, that they were developed by advocate, that they were developed by advocate's engineer, Gawalt.  It's not alleged that Maine Township or anybody else owns the basins that are on advocate's property. And Maine Township, getting even further, Maine Township doesn't issue permits in this case. It's not alleged that Maine Township was a permit issuer to advocate or to Gawalt for the development of this property. Those were allegations directed against Park Ridge and against the district and against the county, I believe. But Maine Township was not a permitter in this case. The allegations against Maine Township with respect to ownership really come down to whether Maine Township, and they've waffled back and forth in this case, the plaintiffs have with respect to Maine Township's ownership of the PCSS, which is the main drain that runs through the subdivision. In the reply, or in the circuit court, excuse me, in the circuit court, Judge Hall did challenge the plaintiffs on whether they had any factual basis for ownership of that system by Maine Township. And the plaintiffs conceded during that argument that they did not. They'd spent two days in the recorder of deeds. They could find no evidentiary basis to allege in the complaint for ownership, and Judge Hall acknowledged that at the hearing. And when that colloquially, when that exchange was brought to this court's attention in the briefs here, the response has been that, oh, well, Maine Township owns the tributary sewers that run from the grates on the streets down into the main drain. So they seem to have abandoned the reply brief that Maine Township has ownership interest in the main system. Rather, Maine Township has interest in just the grates, the sewers that run from the streets into the main system. And if that's the case, and they have to make a plausible allegation based on facts, they can't send conclusory factual allegations in the complaint. They have to make some plausible factual allegation that the debris, which they now allege Maine Township didn't clear debris from those grates. Does Maine Township have anything to do with stormwater runoff? No, not other than they have the grates from the streets. And when storms come down, they send sandbags their way. In the beginning, plaintiffs seemed to assert some sort of negligent sandbagging claim, like too little, too late. But they've now abandoned that in the reply brief, too. They say that that's not their claim. Their claim is instead that Maine Township has these tributary stormwater sewers that run from the streets into the PCSS. Well, before the plans were approved here, did Maine Township have their engineers look at the plan and make suggestions? No, Maine Township did not have their own individual engineers do that. It's alleged that Maine Township, in fact, has not had any – I'll give you the paragraph side – but it's alleged in the complaint that Maine Township has had no structural changes to the said structures that have been planned since the initial Howard Court and D Neighborhood stormwater pipe construction before or in the 1960s. And that's paragraph 1243. Is your opinion that Maine Township had nothing whatsoever to do with the plans and specifications of this project? Nope, it's not alleged. It happens to be within Maine Township territorial boundaries, but that's about it. The permits were all issued by other defendants. It's on other defendants' property. And other than Maine Township contributing to studies to try to figure out how to solve this problem, Maine Township has had no control over the solutions or the property itself. So they had no oversight over the entire project? No, Your Honor. And that's not alleged in the complaint either. All right. Anything further? No, Your Honor. Thank you very much. All right. Richard Blackie? Thank you, Your Honors. May it please the Court. I'll be incredibly brief. I think my colleagues have touched on just about every issue that's at issue in this manner before the Court. The one thing I did want to mention specifically regarding Coleman, since that is the crux of this case, Coleman itself acknowledged that this was a clear reversal of law. And so that lends specifically to the first issue of retroactivity. They acknowledged it was a departure from clear law. I thought they were saying it was very muddled, that it wasn't really clear law. That was one of the reasons that they were abrogating it. The public duty rule itself was clear, that it did exist. Well, they said the cases that had interpreted it, maybe that's what I'm thinking of. Correct. They did go through a significant history. Coleman went through a significant history of the public duty rule. And counsel for plaintiff's reliance on a case from the 1800s ignores the more recent cases that specifically applied the public duty rule to these flooding type cases. So clearly the local public entities had an expectation that it did apply, that it applied in 2008 when this incident happened. And that's a really important issue to focus on procedurally what happened in this case. Plaintiff has been taking advantage of new cases that have come along long after these issues have already been raised and the case should have been dismissed. He argues a lot in Monson. He argues a lot of Coleman. These are all issues that have come down since. And you can see even in the course of this appeal the arguments keep changing to kind of fit the narrative. So clearly the local public entities have relied on this public duty rule that existed at the time of the flooding. Coleman abrogated it. Judge Hall acknowledged that the hardship to the local public entities because of this new clear change in law did not warrant retroactive application. The other thing I wanted to mention briefly is a lot of talk about issuance of permits and the design and construction of this system. Now clearly the Tort Immunity Act immunizes local public entities for any damages caused by issuances of a permit. And that's essentially what the plaintiff is claiming here. And the Tort Immunity Act Section 2104 is clear that it immunizes specific immunity related directly to the issuance of permits. And it applies directly to this case. It was argued in our briefs. I don't think Judge Hall specifically ruled on it, but this Court can consider all those arguments that were raised. Thank you. Thank you. Baso, do you wish to briefly? Briefly. All right, I'll be very brief. You know, this is a problem for the jury. All right, well, take an exception today. I'll try. Your Honor, I'm going to read directly from Saban. This Court has followed Saban in Nichols. The Supreme Court has followed Saban in Wray-Chicago flood. This is the exact text with regards to rejection of the Michigan Rule. Quote, counsel for appellant invokes the doctrine, which seems to prevail in the State of Michigan, that while complaint is made that the original plan of a city improvement is so devised as to render the work dangerous when completed, the fault found is with legislative action, and that suit is grounded upon a wrong attributable to the legislative body itself. And this is the Court's response.  Quote, that in Michigan, a city is not liable for fear to keep its streets and sidewalks in repair, and that the State, the duty of keeping them in repair is the duty to the public, not the private individuals. And the mere neglect of such a duty is nonfeasance only. Then we go to Illinois law. Such a doctrine, however, does not prevail here. As in this State, the jurisdiction and control over the streets and their improvements is conferred upon municipal governments, so that there follows the obligation to keep the streets and sidewalks free from obstructions and reasonable safe conditions. That is Saban, followed both by the Supreme Court in Wray-Chicago litigation, and followed by this Court in Nichols. Further, I won this case twice before Judge Hall. This is a flooding case. It is a flooding case. Well, no, no. It's a sewer overflow case. In a flooding case. It's a sewer overflow case. In a flooding case, this particular piece of property was in a floodplain, was it not? Yes, Your Honor, we plead that special. In a floodplain. And everybody knew. Okay. Everybody knew that. That's right. Everybody knew that. All the municipalities knew that. Okay. Yes. In a floodplain. Yet they approved engineering plans that weren't adequate to protect the homeowners. Isn't that true? That is exactly correct, Your Honor. Isn't that what this case is all about? It is, Your Honor. That certainly is under the Constitution. Then we have to look at Coleman, whether it's retroactive or not retroactive, and that's the sum of the case. But you're somewhere else. Sabin says public duty rule doesn't apply in Illinois. Coleman does not even discuss Sabin. Sabin is an authority that relied upon both, I want to repeat this one last time, in race regarding litigation and in Nichols. Sabin is still good law. Secondly, Judge Hall, with regards to the issue of what is the law in this area, I won this argument in the public duty rule back in March 2011. This is Judge Hall, page 39. This is in the transcript, record 28. Quote, although I have heard a couple new cases, but I don't think the new cases he even just referred to changed the ultimate principles stated in Van Meter, which I think is more on point and where. I do not believe that Alexander furthers defense arguments very far in the nature of a limited decision as presented by the court. She rejects explicitly the public duty rule. They lost that argument back in March 2011. Further, they also lost the argument initially on the issue of prospective retro-adaptation. In August, I think 2016, Judge Hall ruled, based upon Coleman, that there would be retroactivity applied to the decision after the argument. The only way this came up was on a sui sponte decision by Judge Hall, as opposed to addressing my motion to sever advocates from the LPEs. She dismissed these cases. They didn't move to reconsider. This is sort of a bizarre way for this to come back up. And also, clearly, my dear colleague, Mr. Sabin, with regards to getting plenty, please look at 7F of the mission. As we point out, in 2004, they developed storm water management responsibilities for Alford County. Specifically- I don't know that your argument now is proper rebuttal. We've gone through and we've passed this out. Okay, can I just make a couple points this morning? One. For Main Township and one for Park Ridge. Main Township owns, as we plead the complaint, from the borderline between Park Ridge to the east, and to the west, from Robin Alley. This is a drain that there's storm water here. They use it as a sewer. Of course, they're going to argue it's an orphan sewer. The reality is that we plead that it's owned by them. They exercise ownership by draining the storm water into this open drain because of Park Ridge. But these are not issues. The issue is here whether you have a viable cause of action. Well, I understand. It has nothing to do with what you're talking about. Well, they're disputing ownership. I'm sorry. Lastly, thank you. All right. I thank the court for everything. Thank you very much. Thank you. All right. The case was well-argued, well-briefed. I don't know. Counsel, we're not going to allow you to respond to something. Do you have some other procedural matter you need to be addressing? Okay. All right. Thank you. All right. The case will be taken under advisement. Thank you. We're going to recess briefly to reconfigure our panel for the next case. Thank you.